FILED

11/13/17

Date _____ Time _____

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

Civil Action No. _____

**6:17-CV-01959-ORL-40-KRS**

ALEJANDRO GAVIRIA, individually,
and on behalf of All Others Similarly Situated;

      Plaintiff,

v.

DYNAMIC LEDGER SOLUTIONS, INC., a Delaware corporation;
KATHLEEN BREITMAN, an individual;
ARTHUR BREITMAN, an individual;
and TEZOS FOUNDATION, a Swiss corporation;

      Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiff ALEJANDRO GAVIRIA ("Plaintiff"), individually and on behalf of all other persons similarly situated as defined herein, by and through undersigned counsel, hereby sues DYNAMIC LEDGER SOLUTIONS, INC., a Delaware corporation ("DLS"); KATHLEEN BREITMAN, an individual; ARTHUR BREITMAN, an individual; and TEZOS FOUNDATION, a Swiss corporation ("THE FOUNDATION") (DLS and THE FOUNDATION collectively referred to as "TEZOS") ("Defendants"), for damages and for equitable relief. In support thereof, Plaintiff alleges as follows:

### PRELIMINARY STATEMENT

1.    This nationwide class action is brought by Plaintiff ALEJANDRO GAVIRIA, individually and on behalf of a class of similarly situated investors (the "Class Members") who contributed more than $232 million worth of cryptocurrency to an Initial Coin Offering (ICO) propagated by Defendants -- a contribution that, due to the rising value of the cryptocurrency invested by the Plaintiff Class, is now valued at approximately $600 million.

2.      Defendants KATHLEEN BREITMAN and ARTHUR BREITMAN have spent years promoting interest in their effort, in their abilities to provide a groundbreaking new blockchain technology, and in the newly-created cryptocurrency that they purported would skyrocket in demand and value once the technology came to the open market.

3.      In an attempt to evade federal securities laws and scrutiny from the investors, Defendants have purported that the funds they raised were "donations," not investments; and that the newly-created cryptocurrency each investor received in return for his/her/its "donation" (Tezos coins or "Tezzies" or "XTZ") is not a security subject to federal and state securities laws and regulations.

4.      As the old saying goes: "If it walks like a duck, and it quacks like a duck, it's a duck."

5.      Tezzies allegedly derive their value from the usefulness and popularity of the TEZOS network, which was not fully developed or functional at the time Plaintiff and each Class Member made his/her/its investment.  As of the date of this filing, the TEZOS blockchain is purportedly still being developed and, upon information and belief, might never be launched.  In other words, there never was, and may never be, a TEZOS-based coin.

6.      Of course, the investors were never to play any role whatsoever in the development or launch of the TEZOS blockchain.  Rather, the investors invested in a common enterprise and with an expectation that the increased value of their Tezzies would produce a substantial return on their investment that would be derived solely from the efforts of others -- namely, Defendants.

7.      In short, the thing for which Plaintiff and each Class Member invested his/her/its valuable assets looks like a security, functions like a security, and fits the definition of a security. Securities regulators look beyond the form or label someone appends to his/her/its activity and instead consider the actual substance and purpose of the activity.

8.     Notwithstanding Defendants' attempts to avoid governmental and private scrutiny, it is clear that the financiers were indeed profit-seeking investors in a security and that Defendants promoted and conducted an unregistered offering of securities, not a charitable fundraiser -- a security that has already plummeted in value over Defendants' corporate in-fighting and public concern that the TEZOS blockchain might never be launched.

9.     Defendants have already pocketed for themselves tens of millions of dollars for their promotional efforts, and -- due to the many misrepresentations, factual omissions, and unlawful activities engaged in by Defendants -- it appears Plaintiff and the Class cannot, and potentially will not, see any return on their investments.

10.     In describing ICOs as a "fertile ground for fraud on investors," United States Securities and Exchange Commission (SEC) Chairman Jay Clayton recently said: "[I]nvestors often do not appreciate that ICO insiders and management have access to immediate liquidity, as do larger investors, who may purchase tokens at favorable prices.  Trading of tokens on these platforms is susceptible to price manipulation and other fraudulent trading practices."[1]  Mr. Clayton went on to state: "The SEC may not yet have policy or rulemaking answers in these areas, but we are on the lookout for ways to fight the type of opacity that can create an environment conducive to misconduct."

11.     Plaintiff and Class Members seek compensatory and equitable relief rescinding their investments in TEZOS and restoring to them the assets and funds they were fraudulently induced into investing.

---

[1] Jay Clayton, *Governance and Transparency at the Commission and in Our Markets*, Remarks at the PLI 49th Annual Institute on Securities Regulation - New York, NY (November 8, 2017), https://www.sec.gov/news/speech/speech-clayton-2017-11-08.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

## GENERAL ALLEGATIONS

### THE PARTIES

#### Plaintiff

12.     Plaintiff ALEJANDRO GAVIRIA is an individual domiciled in Sanford, Florida and is *sui juris*. On July 1, 2017, Plaintiff GAVIRIA transmitted to TEZOS 25.0799 Ether (then valued at $6,713.64) as his initial investment in the TEZOS ICO.  On July 6, 2017, Plaintiff GAVIRIA transmitted to TEZOS an additional 28 Ether (then valued at $7,440.72) as his follow-up investment in the TEZOS ICO.  Plaintiff GAVIRIA's Ether (now being held by TEZOS) are currently worth approximately $17,347.22.

#### Defendants

13.     Defendant DLS is a Delaware for-profit corporation which lists its principal place of business in San Francisco, California.   DLS is currently controlled by its founders, KATHLEEN BREITMAN and ARTHUR BREITMAN.   It owns all of the TEZOS-related intellectual property, including -- to the extent it even exists -- the source code of the TEZOS cryptographic ledger, logos, and trademark applications associated with the name TEZOS, domain names, and goodwill.

14.     Defendant KATHLEEN BREITMAN is an individual domiciled in San Francisco, California and is *sui juris*.

15.     Defendant ARTHUR BREITMAN is an individual domiciled in San Francisco, California and is *sui juris*.

16.     At all times relevant here, KATHLEEN BREITMAN and ARTHUR BREITMAN ("THE BREITMANS") were, and still are, married to one another.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

17.     Defendant THE FOUNDATION is an entity allegedly based in Zug, Switzerland that is seeking -- but has not yet been granted -- not-for-profit status.  THE FOUNDATION is allegedly managed by a three-person Board of Directors, headed by THE FOUNDATION's President, Johann Gevers.  As explained in greater detail below, it is unclear who is actually managing THE FOUNDATION's operations; as in-fighting between THE BREITMANS and Mr. Gevers -- and THE BREITMANS' recent attempt to usurp managerial control over THE FOUNDATION's operations -- are ongoing and are causing widespread uncertainty as to who is truly controlling THE FOUNDATION.  The only thing that is clear is that THE BREITMANS believe they can exert from the United States their control over TEZOS's operations and the assets it holds, wherever in the world they may be found.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds Five Million Dollars ($5,000,000.00), exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than Defendants.  *See*, 28 U.S.C. § 1332(a) and 1332(d)(2)(A).  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### Personal Jurisdiction

19.     This Court has personal jurisdiction over Defendants because: (a) at least one Defendant is operating, present, and/or doing business within this District, and (b) Defendants' breaches and unlawful activity occurred within this District.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

20.     Defendants solicited investors in this jurisdiction, including Plaintiff ALEJANDRO GAVIRIA, to participate in the TEZOS ICO -- reaping from those investors large sums of money and other assets, including valuable cryptocurrency.

21.     In light of the foregoing, Defendants have purposefully availed themselves of the benefits of operating in this jurisdiction; and this Court may exercise personal jurisdiction over Defendants.

### Venue

22.     Venue is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district, as several of the TEZOS investors reside in Florida.

23.     In light of the foregoing, this District is a proper venue in which to adjudicate this dispute.

### FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### A Brief Primer on Cryptocurrencies

24.     Although precise definitions vary, the United States Internal Revenue Service (IRS) has defined cryptocurrency (a/k/a "virtual currency") as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.  In some environments, it operates like a "real" currency.  Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as "convertible" virtual currency.

25.     Among the most popular and widely-used cryptocurrencies are Bitcoin (BTC) and Ether (ETH).

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

26.     Bitcoin, Ether, and other convertible currencies of their type rely upon cryptography (and unique digital signatures) for security based on public and private keys and complex mathematical algorithms.  Moreover, they run on decentralized peer-to-peer networks of computers and "miners" that operate on open-source software and do "work" to validate and irrevocably log transactions on a permanent public distributed ledger visible to the entire network (the "blockchain").  By functioning this way, users are able to transfer ownership between one another without the need for a trusted, central intermediary like a government regulator.

27.     Bitcoin and Ether exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law) or other convertible digital currencies.  When a user wishes to purchase Bitcoin or Ether from an exchanger, the user will typically send payment in the form of fiat currency, often via bank wire or ACH or other convertible digital currency, to the exchanger for the corresponding quantity of Bitcoin or Ether, based on a fluctuating exchange rate.  The exchanger, often for a commission, will then typically attempt to broker the purchase with another user of the exchange that is trying to sell Bitcoin or Ether, or, in some instances, will act as the seller itself.  If the exchanger can place a buyer with a seller, then the transaction can be completed.

### The ICO Market

28.     While in traditional Initial Public Offerings (IPOs), a start-up company offers its investors company stock in exchange for investment capital; a company promoting an ICO offers something different to its investors: cryptocurrency such as Bitcoin, Ether, or a newly-created virtual currency issued or managed by the start-up company in exchange for the investors' capital, which itself might be pre-existing cryptocurrency owned by the investors.

29.     Much like capital stock, the value of cryptocurrency can rise or fall with the success or failure of the start-up venture.

30.     Moreover, much like with traditional IPOs, the financial fortunes (or misfortunes) of the investors whose funds are used to fuel the new venture rely upon the knowledge, skill, and efforts of someone other than themselves -- specifically, the promotors or operators of the new venture.

### Tezos Is Born

31.     According to published reports, ARTHUR BREITMAN -- in or around the summer of 2014 -- developed the concepts underlying TEZOS's technology, though he did so by publishing a Tezos Position Paper and a Tezos White Paper under a pseudonym ("L.M. Goodman") for fear of violating his obligations of loyalty to his then-employer, Morgan Stanley.

32.     In early-2015, ARTHUR BREITMAN -- a self-described "crypto-anarchist" -- told others that he wanted to start a business based on TEZOS, but he did not want to be publicly associated with the effort.

33.     At that time, ARTHUR BREITMAN was registered with the U.S. Financial Industry Regulatory Authority (FINRA) as a financial representative working at Morgan Stanley.

34.     FINRA Rule 3270 requires each registered securities professional to provide prior written notice to his/her employer before he/she can conduct outside business activities if he/she has a "reasonable expectation of compensation" from those activities.

35.     Also in early-2015, ARTHUR BREITMAN wrote a "Tezos Business Plan" which projected that if the company survived fifteen (15) years, it would be worth between $2 Billion and $20 Billion.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

36.     The business plan called for raising $5 Million to $10 Million over two to three years and also included a budget that called for paying ARTHUR BREITMAN a $212,180 salary by the company's third year in existence.

37.     In August 2015, ARTHUR BREITMAN -- while still working at Morgan Stanley -- incorporated DLS and named himself DLS's Chief Executive Officer.

38.     In violation of FINRA Rule 3270, ARTHUR BREITMAN pitched "Tezos, Inc." in 2015.

39.     However, those efforts -- and ARTHUR BREITMAN's involvement with DLS and TEZOS -- were not disclosed to Morgan Stanley.

40.     In April 2016, ARTHUR BREITMAN left Morgan Stanley without ever having disclosed under FINRA Rule 3270 his involvement with DLS and TEZOS.

### Tezos Winds Up For Its Big Pitch

41.     Having failed with his initial Tezos fundraising effort, ARTHUR BREITMAN -- joined by his wife KATHLEEN BREITMAN -- started working in or about September 2016 on a new strategy for TEZOS: conducting an online fundraiser (the "TEZOS ICO") to distribute to whoever invested with TEZOS their money or assets newly-created digital tokens ("Tezzies" or XTZ), whose holders would maintain the TEZOS blockchain.

42.     According to the Tezos.com website, they received -- over the next six months -- $612,000 from ten early backers, including several cryptocurrency hedge funds.

43.     To conduct the ICO, ARTHUR BREITMAN and KATHLEEN BREITMAN helped create THE FOUNDATION in Zug, Switzerland.

44.     As KATHLEEN BREITMAN told Reuters in the midst of their pre-ICO promotional efforts, she and ARTHUR BREITMAN opted to use a foundation based in Zug

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

because Switzerland has "*a regulatory authority that had a sufficient amount of oversight* **but not like anything too crazy**."[2]

45.     According to documents on the Tezos website, the plan was for THE FOUNDATION to raise money via the ICO, then acquire DLS and all of its TEZOS-related intellectual property, including the source code of the TEZOS cryptographic ledger, logos, and trademark applications associated with the name TEZOS, domain names, and goodwill.

46.     The website further explains that THE FOUNDATION and DLS "have negotiated a contractual agreement in which THE FOUNDATION will acquire DLS and release its IP under a free software license." THE FOUNDATION will "also acquire DLS's existing business relationships with contractors and potential customers, as well as its trademark applications and domain names."

47.     One of the earliest investors in TEZOS was Silicon Valley venture capital billionaire Tim Draper who -- through his company Draper Associates -- invested $1.5 Million in TEZOS, in return for which he was given a minority stake in DLS.

48.     Mr. Draper was solicited by KATHLEEN BREITMAN, who not only desperately needed Mr. Draper's cash to keep the TEZOS effort moving forward but also the goodwill attached to his name to bolster the perception of legitimacy and interest surrounding TEZOS's efforts.

---

[2] Anna Irrera, Steve Stecklow, and Brenna Hughes Neghaiwi, *Backroom Battle Imperils $230 Million Cryptocurrency Venture*, Reuters (October 18, 2017), https://www.reuters.com/article/bitcoin-funding-tezos/special-report-backroom-battle-imperils-230-million-cryptocurrency-venture-idUSL4N1MT531 (emphasis added).

**And Here's The Pitch . . . .**

49.     In the months leading up to the TEZOS ICO, Defendants -- particularly ARTHUR BREITMAN and KATHLEEN BREITMAN -- made numerous public statements exaggerating the progress of the TEZOS network, misrepresenting the relationship between Defendants (specifically, the relationship between DLS and THE FOUNDATION), misrepresenting the desirability of TEZOS's technology, and misrepresenting when tangible benefits from investments would be received.

50.     ARTHUR BREITMAN and KATHLEEN BREITMAN spoke to numerous media outlets and interested audiences in heavily promoting their efforts to raise additional interest in investing in TEZOS.

**We Have Relationships and Interest in Tezos . . . That We Don't Really Have**

51.     For example, to promote the TEZOS ICO and lure in a larger group of investors, TEZOS retained a U.S.-based communications company (Strange Brew Strategies) who, TEZOS believed, would reach a wide audience of potential investors.

52.     Among the representations made by Strange Brew Strategies on TEZOS's behalf were that TEZOS's applications had been recognized and adopted by such well-known and well-established companies as the accounting firms Ernst & Young and Deloitte and the French software company LexiFi.

53.     Contrary to that representation, Ernst & Young has publicly denied ever having adopted TEZOS's applications.

54.     Likewise, Deloitte has publicly denied using TEZOS's technology for any of its client projects.

55.     Similarly, LexiFi has publicly denied adopting TEZOS's technology.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

**Our Technology Is Close To Launch . . . Except It Is Not Actually Close**

56.     Additionally, on the TEZOS website, Defendants also exaggerated the development of the TEZOS project.  For example, the following was given as one of the reasons given as the "rationale" FOR THE BREITMANS' compensation:

> A large subset of the projects conducting fundraisers (sometimes called "ICOs") today are based on little more than a white paper and will remain in a development phase for years.  Participants in those fundraisers have no idea how much of their contributions will be spent bringing those projects to fruition -- if they ever reach that point.  In contrast, Tezos established a working testnet in February 2017 which can be accessed upon request to assess the state of the completion of the Tezos project.  Most of the remaining development consists of performing security audits and improving the test coverage of the project so it can confidently launch as a public blockchain.

57.     In a May 19, 2017 blog post published to stoke the embers of interest in TEZOS, ARTHUR BREITMAN wrote that the TEZOS team could reasonably launch the TEZOS network "in a three- to four-month period . . . ."  Giving his worst-case projection, ARTHUR BREITMAN continued: "It's entirely within the realm of possibility that the project takes up to 6 months to ship.  Based on my assessment of the remaining development . . . that does not seem likely, but it's not impossible."

58.     In June 2017, the TEZOS website similarly proclaimed that "[t]he development team estimates that the time to completion [of the Tezos network] is around 4 months."

59.     As of the date of this filing, the TEZOS network has still not launched; and there are no reasonably reliable signs that the network is anywhere near completion.

60.     According to recent public statements by ARTHUR BREITMAN, the network is now not expected to be completed until February 2018 at the earliest.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

**Tezos to Investors: You'll Get Your Tezzies Soon . . . Or Someday . . . Or Never**

61.     While THE FOUNDATION was created to purchase DLS (and the TEZOS source code that makes TEZOS functional), Defendants did not disclose to ICO investors the terms of THE FOUNDATION's acquisition of DLS or how long that acquisition would take.

62.     Upon information and belief, DLS shareholders have up to two years to exercise a contractual option to sell their shares to THE FOUNDATION.   That two-year period commences two months after the TEZOS network launches, which presently has no set date for its launch.

63.     If the DLS shareholders do not timely exercise their option to sell their shares to THE FOUNDATION within the allotted two-year time period, THE FOUNDATION has up to one year thereafter to purchase DLS.

64.     As noted above, it is entirely unclear at this time when the TEZOS network will be ready to launch, if ever.  According to statements made by KATHLEEN BREITMAN and ARTHUR BREITMAN to media sources, the "current best estimate" for launch of the TEZOS network is February 2018 -- though that is merely an estimate that can be extended further into the future if TEZOS's computer network is "not ready" for launch at that time.

65.     Therefore, TEZOS investors might be waiting for three years, or more, before THE FOUNDATION fulfills its obligation to purchase DLS -- the action that will link the investors' funds with the blockchain source code in which they invested and thus give value to the Tezzies the investors purchased.

66.     That time frame -- which was a highly-material fact to investors -- was not disclosed to TEZOS ICO investors.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

67.     Meanwhile, contracts on the future value of Tezzies have already reportedly plummeted by as much as seventy-five percent (75%).

68.     As shown above, Defendants' statements about the progress of the TEZOS network, the desirability of and demand for TEZOS's technology, and the time within which investors would receive a tangible benefit for their investments were materially false and misleading.

69.     Had Defendants not materially misled investors, many investors would not have participated in the ICO.

### The Tezos ICO -- July 2017

70.     After an initial delay from its planned May 2017 commencement, the TEZOS ICO was conducted in July 2017.

71.     The terms of the fundraising offer are memorialized in a document titled "Tezos Contribution and XTZ Allocation Terms and Explanatory Notes" (the "TEZOS ICO Terms for Investors"). A true and correct copy of the TEZOS ICO Terms for Investors is attached hereto as **Exhibit "A"**.

72.     Upon information and belief, not all investors in the ICO saw, agreed to, or were aware of the TEZOS ICO Terms for Investors. Many investors relied solely on information TEZOS had disseminated through various media sources, cryptocurrency blogs, conventions at which they spoke, and podcasts.

73.     According to the TEZOS ICO Terms for Investors, investors -- upon the launch of the fully-functional TEZOS network -- would be allocated 5,000 Tezzies for each Bitcoin invested during the ICO. The TEZOS ICO was uncapped, meaning that there was "no limit on the amount of contributions that [were] accepted."

74.     Moreover, to create a greater sense of urgency and heighten investor interest, the ICO provided for "time-dependent bonus[es]." The TEZOS website described the bonuses thusly: "From 20% at the outset, the bonuses will decrease progressively to 0% over four additional periods (15%, 10%, 5%, and 0%) lasting 400 Bitcoin blocks [approximately two days and eighteen hours] each."

75.     The one-sided terms imposed upon Plaintiff and the Class Members in the TEZOS ICO Terms for Investors are both unconscionable and illusory. The TEZOS ICO Terms for Investors purport to require agreement from the investors that, despite the investors' investments, TEZOS might not allocate to the investors any Tezzies when the TEZOS network is created, TEZOS might not create any Tezzies at all, any Tezzies created might be useless or valueless, and TEZOS has the right to abandon all efforts to develop and release the TEZOS network -- all while retaining the investors' invested funds and assets. Moreover, the onerous manner in which TEZOS imposed upon investors its Terms render the Terms unfair, unconscionable, oppressive, and a contract of adhesion.

76.     Notwithstanding the adhesive, oppressive, and unconscionable terms of the offering, the "fear of missing out" hyped up by TEZOS succeeded; as the vast majority of investments occurred during the first few days of the ICO.

77.     The TEZOS ICO was ultimately conducted over the course of two weeks in July 2017 (July 1, 2017 - July 14, 2017).

78.     When she spoke to Reuters in the month preceding the ICO, KATHLEEN BREITMAN said that when she, her husband, and the TEZOS team decided to conduct the online fundraiser, "we were like, 'Hey, we would be lucky if we get 20 million [dollars].'"

79.     Well beyond that target of $20 million, the project received from investors about 65,703 Bitcoins and 361,122 Ether -- a sum valued at approximately $232 million at the time.  As of the date of this filing, that sum has increased in value to more than $600 million.

80.     Upon information and belief, Defendants were aware in July 2017 that third parties were re-selling access to the TEZOS ICO and future rights regarding ownership of Tezzies.

### Follow The Money . . . Right to Defendants' Pockets

81.     The TEZOS crowdfunding site also contained a detailed yet deceiving chart demonstrating how funds raised would be spent, based on the amount raised, *to wit*:

82.     Although TEZOS raised more than 10 times beyond its wildly-optimistic $20 Million "Mars-Shot," Defendants are not believed to have spent any money on any of the identified by TEZOS.

83.     To the contrary, TEZOS has instead spent the money by paying Defendants and the TEZOS insiders.

84.     While Defendants have taken the public position that no profit was to be made or expected from the $232 million ICO, the TEZOS insiders have already reaped from the funds invested huge profits for themselves -- something that would not have happened if the TEZOS ICO were a mere charitable fundraiser.

85.     According to the terms of the TEZOS ICO, eight-and-a-half percent (8.5%) of all contributed funds were allocated in U.S. Dollars to DLS and its shareholders -- a sum payable as soon as TEZOS functions as a blockchain (successfully or not) for at least three months.  An additional ten percent (10%) of all Tezzies issued in the genesis block would also go to TEZOS's founders.

86.     If Tezzies were merely utility tokens as Defendants have claimed, the TEZOS insiders would have no need for such tokens.  The purpose of the token is the intrinsic value for which it will trade on the open exchanges.

87.     When the TEZOS ICO was conducted, the funds raised from investors (in the form of Bitcoin, Ether, and other sources) were valued at approximately $232 million.; and the 8.5% flowing therefrom to DLS shareholders was approximately $20 million.

88.     With the dramatic rise in the value of Bitcoin and Ether since July 2017 (when the TEZOS ICO was conducted), the funds raised from investors in the ICO are presently valued at approximately $600 million; and **the 8.5% flowing to DLS shareholders is now valued at approximately $50 million**.

89.     KATHLEEN BREITMAN and ARTHUR BREITMAN (along with Tim Draper) are believed to be the largest, if not only, shareholders in DLS.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

90.    Based on the large volume of shares they own in DLS, KATHLEEN BREITMAN and ARTHUR BREITMAN are believed to have already been allocated tens of millions of dollars in cash from the TEZOS ICO.

91.    Regardless of whether the functionality underlying TEZOS's technology is a success (thus providing value to ICO investors), TEZOS insiders -- including KATHLEEN BREITMAN and ARTHUR BREITMAN -- will get paid their tens of millions of dollars in cash. If the technology is a success, that payment only goes up when also factoring in the 10% bonus being paid to TEZOS's founders.

92.    As noted above, SEC Chairman Jay Clayton warns that fundraising efforts in exchange for tokens issued for start-up or open-source projects are ripe for misconduct -- especially because "insiders and management have access to immediate liquidity, as do larger investors."

**The SEC and the DAO Report: If It Walks Like A Duck and It Quacks Like A Duck . . . .**

93.    While TEZOS insiders reap the financial windfall that was generated from the ICO (and stand to garner tens of millions of dollars more when they pay themselves their 10% bonuses), Defendants purport that no such rewards are due, or are owed, to the investors who funded the ICO.

94.    TEZOS does not like to refer to its financiers as "investors"; rather, TEZOS refers to them as "donors" and the $232 million they contributed as "non-refundable donations."

95.    Notwithstanding TEZOS's formal characterization of its efforts as some sort of charitable endeavor for which participants were given the future right to own Tezzies in exchange for their financial support, the SEC has been studying the ICO market and declared, in July 2017, that "the virtual coins or tokens that are offered or sold [to ICO investors] may be securities" subject to all federal and state securities laws.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

96.     As the SEC stated in its July 2017 report (the "DAO Report")[3]:

The Commission is aware that virtual organizations and associated
individuals and entities increasingly are using distributed ledger technology
to offer and sell instruments such as DAO Tokens to raise capital.  These
offers and sales have been referred to, among other things, as "Initial Coin
Offerings" or "Token Sales."    Accordingly, the Commission deems it
appropriate and in the public interest to issue this Report in order to stress
that the U.S. federal securities law may apply to various activities, including
distributed ledger technology, depending on the particular facts and
circumstances, without regard to the form of the organization or technology
used to effectuate a particular offer or sale.  In this Report, the Commission
considers the particular facts and circumstances of the offer and sale of
DAO Tokens to demonstrate the application of existing U.S. federal
securities laws to this new paradigm.

97.     The DAO Report went on to state:

[Federal securities registration] requirements apply to those who offer
and sell securities in the United States, regardless whether the issuing entity
is a traditional company or a decentralized autonomous organization,
regardless whether those securities are purchased using U.S. dollars or
virtual currencies, and regardless whether they are distributed in certificated
form or through distributed ledger technology.  In addition, any entity or
person engaging in the activities of an exchange, such as bringing together
the orders for securities of multiple buyers and sellers using established
nondiscretionary methods under which such orders interact with each other
and buyers and sellers entering such orders agree upon the terms of the
trade, must register as a national securities exchange or operate pursuant to
an exemption from such registration.

98.     Ultimately, the DAO Report concluded that DAO Tokens -- a newly-issued

cryptocurrency created by The DAO (an unincorporated organization), German-based company

Slock.it, and Slock.it's co-founders which were given to investors in The DAO's distributed ledger

or blockchain-enabled means for raising capital -- are securities under the Securities Act of 1933

and the Securities Exchange Act of 1934.

---

[3] https://www.sec.gov/litigation/investreport/34-81207.pdf.

99.   If TEZOS tokens are likewise deemed "securities" subject to federal and state securities laws, they will not be allowed to be traded on U.S. exchanges because the securities were not properly registered.

100.   One of the greatest values the owner of a security has is his/her/its ability to trade that security on the open market for an appropriate monetary value.  When robbed of the ability to trade the security, the owner is also robbed of much, if not all, of the value attached to that security.

### Pre-Network Launch Tokens Are Securities

101.   By their very nature, tokens sold before a network launch are securities, because investors purchasing those tokens are relying on the technical and managerial efforts of others to affect the failure or success of the enterprise.

102.   While pre-network launch tokens may someday have a consumptive use, the fact that they have no pre-launch utility renders them almost entirely dependent upon the efforts of the issuer to successfully develop and launch a functional network.

103.   Here, Plaintiff and the Class were (and still are) entirely dependent upon TEZOS to launch its network and provide some valuable use to the to-be-issued Tezzies for which Plaintiff and the Class have already provided their investment funds.

### Tezos Investors: We Made Investments on Which We Expect A Profit

104.   Just as suggested by the SEC in the DAO Report, many investors in TEZOS indeed consider themselves investors, not "donors," in TEZOS's efforts; and those investors expect a return on their investments.

105.    For example, Kevin Zhou -- co-founder of the cryptocurrency trading fund Galois Capital -- told Reuters: "For me and for a lot of people, this is an investment.  We are looking for a return."

106.    Similarly, Tim Draper himself told Reuters that cryptocurrencies are commodities like pork bellies; and he characterized acquiring Tezzies as a purchase rather than a donation.

107.    So too do Plaintiff and the Class view their financial contributions as investments that were made dependent upon Defendants' representations and efforts.

108.    In fact, KATHLEEN BREITMAN herself has conceded to multiple media outlets that Defendants are well-aware that the Class Members view the endeavor as a speculative investment into which they are buying in return for what is expected to be a financial profit:

- *"What we're going to do is allow as many people who want to **buy into the crowdsale** over a two-week period."*[4]

- *Q: Crowds don't always get things right[;] and **in this case[,] your crowd may be speculators**.  There's been a lot of speculative buying in China[,] for instance.  **Do you worry about who the tokenholders are** and whether their incentives are aligned with Tezos?*

   *A: It's tough.  \*\*\* **[C]ertainly there are a lot of people who are interested in the more speculative aspects**.  I think there's a lot of fervor and froth in the marketplace right now.  That does make it a bit odd to launch something that's more community-based on some level when **there's a lot of people who are just profit-seeking**.*[5]

109.    Here, TEZOS's managers themselves have acknowledged that fact by revealing in their own pre-fundraiser "Static Paper" that several layers of pre-functional launch contributors

---

[4] Gertrude Chavez-Dreyfuss, *Exclusive: Billionaire investor Draper to participate in blockchain token sale for first time*, Reuters (May 5, 2017), http://uk.reuters.com/article/us-tezos-blockchain-draper/exclusive-billionaire-investor-draper-to-participate-in-blockchain-token-sale-for-first-time-idUKKBN181250 (further noting that billionaire venture capitalist Tim Draper viewed Tezos' token offering as a "non-traditional investment.") (emphasis added).

[5] *RRE Ventures Perspectives -- Kathleen Breitman - Tezos Unleashed* (July 12, 2017), https://blog.rre.com/14-kathleen-breitman-tezos-unleashed-d0921294ec91 (emphasis added).

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

will be paid cash and Tezzies for their contributions to the development of the technology and the promotion of the ICO:



110.    While Defendants and several TEZOS insiders are already slated to be paid, Plaintiff and the Class cannot say the same.

**Infighting at Tezos Has Rendered The Entire Project in Doubt**

111.    For several months following the ICO, neither THE FOUNDATION nor DLS had provided to investors or the general public any significant status updates on when the TEZOS blockchain might launch and when everyone's funding and efforts would reach their fruition.

112.    On or about October 18, 2017, ARTHUR BREITMAN -- individually, and on behalf of TEZOS -- published a blog post titled "The Path Forward," conceding that progress since the ICO "had fallen short of our expectations."

113.    According to ARTHUR BREITMAN's blog post, THE FOUNDATION's President (Johann Gevers) was responsible for acts of "self-dealing, self-promotion, and conflicts of interest." ARTHUR BREITMAN called for Mr. Gevers' prompt removal and sought to

restructure the relationship between DLS and THE FOUNDATION so that KATHLEEN BREITMAN and ARTHUR BREITMAN would be able to take a "substantial role" in managing TEZOS's future without unnecessary interference from Mr. Gevers and/or THE FOUNDATION. Moreover, the blog post concluded that "[o]ur current best estimate for shipping the [Tezos] main net is now February 2018, though the firm date [*sic.*] remains 'when it is ready.'"

114.    Mr. Gevers responded to the accusations by refusing to step down from his post at THE FOUNDATION and by casting equally-venomous accusations back at THE BREITMANS. He accused ARTHUR BREITMAN of "character assassination" and alleged that THE BREITMANS were "attempting an illegal coup." Mr. Gevers further alleged that THE BREITMANS' effort to usurp power was "unnecessarily putting the project at risk."

115.    As of the date of this filing, DLS has not yet sold its shares to THE FOUNDATION; and, amidst all of the in-fighting, TEZOS futures have plummeted by approximately 50-75% of their value at their peak.

### No Safe Harbor

116.    The statutory safe-harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

117.    Many of the specific statements pleaded herein were no identified as "forward-looking statements" when made.

118.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

119.    Alternatively, to the extent the statutory safe-harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false or that the forward-looking statement was authorized or approved by an executive officer of TEZOS, who knew those statements were false when made.

### THE TEZOS FORUM SELECTION CLAUSE, CHOICE OF LAW PROVISION, AND ANTI-CLASS-ACTION PROVISIONS ARE ALL UNENFORCEABLE

120.    The terms and conditions of the ICO purport to restrict all disputes arising out of the ICO to "the ordinary courts of Zug, Switzerland," mandate that Swiss law applies, and preclude participation in class actions.  All of these provisions are unenforceable for a variety of reasons.[6]  By way of example only, Plaintiff addresses some of these bases below.

121.    First, the ICO, including each and every one of its provisions, was induced by fraud and overreaching.  Defendants designed the ICO with the specific intent to evade U.S. federal and state securities laws; and in so doing, to deprive Plaintiff and the Class of the ability to enforce such rights in U.S. courts.  To reward Defendants' attempts to evade U.S. federal and state securities by enforcing any or all such provisions would contravene a strong public policy in favor of enforcing such rights and laws.

122.    Similarly, enforcing such provisions would deprive Plaintiff and the Class of their day in court because of both the inconvenience and unfairness of the forum Defendants chose to

---

[6] Plaintiff does not waive his rights to argue, and specifically reserves his right to argue, that these provisions are unenforceable based on facts and legal arguments not addressed herein.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

facilitate their attempts to evade U.S. law and render themselves immune from suit. That would also effectively serve to deprive Plaintiff and the Class of a remedy.

123.    For the same reasons, the ICO and its anti-class-action provision are both procedurally and substantively unconscionable, and therefore unenforceable. Here, Plaintiff and the Class were fraudulently induced to participate in the ICO, based on -- as set forth herein -- the Defendants' misrepresentations and omissions. Every aspect of the ICO and its "take-it-or-leave-it" terms were intended to separate Plaintiff and the Class from their funds and render Defendants effectively immune from suit by the vast majority of their investors, who Defendants knew or should reasonable have known are U.S. residents. In fact, KATHLEEN BREITMAN herself has publicly admitted that "[w]e didn't do much marketing outside of the U.S. Well, rather, Arthur and I are based in the U.S., and we talk about the technology in mainstream U.S. press outlets . . . ."[7]

124.    In short, the ICO and its contractual provisions (including, but not limited to, the anti-class-action provision) are unreasonable and to an outrageous degree unfair to Plaintiff and the Class.

## FACTS SPECIFIC TO INVESTOR PLAINTIFF

### Alejandro Gaviria

125.    As noted above, Plaintiff ALEJANDRO GAVIRIA, on July 1, 2017, invested with TEZOS 25.0799 ETH; and on July 6, 2017, he invested with TEZOS an additional 28 ETH. Those 53.0799 ETH (now being held by TEZOS) are currently valued at approximately $15,660.00.

126.    To make his investment, Plaintiff ALEJANDRO GAVIRIA logged onto to the TEZOS website from his home in Sanford, Florida and followed the instructions provided.

---

[7]    *RRE Ventures Perspectives -- Kathleen Breitman - Tezos Unleashed* (July 12, 2017), https://blog.rre.com/14-kathleen-breitman-tezos-unleashed-d0921294ec91.

## CLASS ACTION ALLEGATIONS

127.   A class action is the proper form to bring Plaintiff's and the Class Members' claims under FRCP 23. The potential class is so large that joinder of all members would be impractical. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

128.   Plaintiff brings this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all members of the following class and subclass:

> **NATIONWIDE CLASS:** All TEZOS investors who, between July 1, 2017 and July 15, 2017, transferred Bitcoins, Ether, alternative cryptocurrencies, or any other form of monies or currency to TEZOS in furtherance of TEZOS' ICO. Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.
>
> The Nationwide Class asserts claims for Unregistered Offer and Sale of Securities in Violation of Sections 5(a) and 5(c) of the Securities Act; Fraud in the Offer and Sale of Securities in Violation of Section 17(a)(1) of the Securities Act; Fraud in the Offer and Sale of Securities in Violation of Section 17(a)(2) and 17(a)(3) of the Securities Act; Rescission of Contract; and Alter Ego Liability (*see* Counts I – V).
>
> **FLORIDA SUBCLASS:** All Florida resident TEZOS investors who, between July 1, 2017 and July 15, 2017, transferred Bitcoins, Ether, alternative cryptocurrencies, or any other form of monies or currency to TEZOS in furtherance of TEZOS' ICO. Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.
>
> The Florida Subclass asserts claims for Unregistered Offer and Sale of Securities in Violation of Fla. Stat. §§ 517.011, *et seq.*;

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

Fraud in the Offer and Sale of Securities in Violation of Fla. Stat. §§ 517.011, *et seq.*; and Violation of Florida's Deceptive and Unfair Trade Practices Act, Chapter 501, § 211(1), Fla. Stat. ("FDUTPA") (*see* Counts VI - VIII).

129.    This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

## Numerosity

130.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

131.    While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

132.    Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

133.    It is impractical for each class member to bring suit individually.

134.    Plaintiff does not anticipate any difficulties in managing this action as a class action.

## Commonality and Predominance

135.    There are many common questions of law and fact involving and affecting the parties to be represented.

136.    When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions.

137.    Common questions include, but are not limited to, the following:

(a) Whether the Tezzies offered for sale during the TEZOS ICO constitute securities under federal and state securities laws;

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

(b) Whether TEZOS violated federal and state securities laws in conducting its Initial Coin Offering and in failing to register its Tezzies as securities;

(c) Whether statements made by Defendants before and during the TEZOS ICO misrepresented material facts about the TEZOS network and the value of Tezzies;

(d) Whether TEZOS has converted the funds belonging to Plaintiff and the Class Members;

(e) Whether TEZOS owed duties to Plaintiff and the Class Members, what the scope of those duties were, and whether TEZOS breached those duties;

(f) Whether TEZOS's conduct was unfair or unlawful;

(g) Whether the terms of TEZOS's ICO Terms for Investors are unconscionable, void, or voidable;

(h) Whether TEZOS has been unjustly enriched; and

(i) Whether Plaintiff and the Class Members have sustained damages as a result of TEZOS's conduct.

138.    These common questions of law or fact predominate over any questions affecting only individual members of the Class.

## Typicality

139.    Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

140.    Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Class.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

## Adequacy of Representation

141.    Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

142.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent him.

143.    Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.

144.    The infringement of the rights and the damages Plaintiff has suffered are typical of other Class members.

145.    To prosecute this case, Plaintiff has chosen the law firms of Silver Miller and the Wites Law Firm.  These firms are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

## Superiority

146.    Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein.

147.    Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

148.    Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a well-funded corporate defendant like TEZOS.

149.    Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical.

150.    The nature of this action and the nature of laws available to Plaintiff make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class Members for the wrongs alleged because:

> (a) Defendant would necessarily gain an unconscionable advantage if it were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources;
>
> (b) The costs of individual suits could unreasonably consume the amounts that would be recovered;
>
> (c) Proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged;
>
> (d) Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;
>
> (e) The Class Members are geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit;
>
> (f) There are no known Class Members who are interested in individually controlling the prosecution of separate actions; and
>
> (g) The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum.

151.    Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

152.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

153.    Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

154.    As a result of the foregoing, Plaintiff and the Class Members have been damaged in an amount that will be proven at trial.

155.    Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

156.    To enforce his rights, Plaintiff has retained undersigned counsel and is obligated to pay counsel a reasonable fee for its services, for which Defendants are liable as a result of their bad faith and otherwise.

## COUNT I – UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 156 above, and further alleges:

157.    Defendants, by engaging in the conduct described above, directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to actually sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

158.    Defendants are "sellers" within the meaning of 15 U.S.C. § 77e because they or their agents solicited Plaintiff's and the Class Members' investments in the TEZOS ICO.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

159.   The terms of the TEZOS ICO called for an investment of cryptocurrency or fiat currency by Plaintiff and the Class Members.

160.   The funds paid by Plaintiff and the Class Members pursuant to the TEZOS ICO were pooled by Defendants in an effort by Defendants to secure a profit for themselves and the investors.  As a result, the investors, including Plaintiff and the Class Members, shared in the risks and benefits of the investment.

161.   Plaintiff and the Class Members relied on, and are dependent upon, the expertise and efforts of Defendants for their investment returns.

162.   Plaintiff and the Class Members expected that they would receive profits from their investments in Defendants' efforts.

163.   Tezzies constitute investment contracts and are therefore subject to federal securities laws, including the registration requirements promulgated thereunder.

164.   No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

165.   By reason of the foregoing, Defendants have violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

166.   As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and the Class Members have suffered damages in connection with their respective purchases of Tezzies securities in the TEZOS ICO.

167.   Defendant KATHLEEN BREITMAN is subject to liability by virtue of her top-level executive position with DLS and her undeniable influence over THE FOUNDATION, which provided her the power to control or influence TEZOS's actions.  For example, KATHLEEN BREITMAN is an executive of DLS, is one of its only shareholders, and is

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

responsible for much of the company's day-to-day operations, including its operations vis-à-vis Plaintiff and the Class Members. As a top-level executive and controlling person of TEZOS, KATHLEEN BREITMAN knew of, or recklessly disregarded, the alleged misrepresentations made by TEZOS in connection with the ICO.

168.   Defendant KATHLEEN BREITMAN is a culpable participant in the fraudulent scheme described herein and caused TEZOS to engage in the acts and omissions which give rise to liability under 15 U.S.C. § 77e.

169.   Accordingly, Defendant KATHLEEN BREITMAN is a "controlling person" of TEZOS within the meaning of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

170.   Plaintiff and the Class Members have suffered damages as a result of Defendant KATHLEEN BREITMAN's violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

171.   Likewise, Defendant ARTHUR BREITMAN is subject to liability by virtue of his top-level executive position with DLS and his undeniable influence over THE FOUNDATION, which provided him the power to control or influence TEZOS's actions. For example, ARTHUR BREITMAN is an executive of DLS, is one of its only shareholders, and is responsible for much of the company's day-to-day operations, including its operations vis-à-vis Plaintiff and the Class Members. As a top-level executive and controlling person of TEZOS, ARTHUR BREITMAN knew of, or recklessly disregarded, the alleged misrepresentations made by TEZOS in connection with the ICO.

172.   Defendant ARTHUR BREITMAN is a culpable participant in the fraudulent scheme described herein and caused TEZOS to engage in the acts and omissions which give rise to liability under 15 U.S.C. § 77e.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

173.    Accordingly, Defendant ARTHUR BREITMAN is a "controlling person" of TEZOS within the meaning of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

174.    Plaintiff and the Class Members have suffered damages as a result of Defendant ARTHUR BREITMAN's violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

## COUNT II – FRAUD IN THE OFFER AND SALE OF SECURITIES IN VIOLATION OF SECTION 17(a)(1) OF THE SECURITIES ACT

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 156 above, and further alleges:

175.    Defendants are "sellers" within the meaning of 15 U.S.C. § 77l(a) because they or their agents solicited Plaintiff's and the Class Members' investments in the TEZOS ICO.

176.    The terms of the TEZOS ICO called for an investment of cryptocurrency or fiat currency by Plaintiff and the Class Members.

177.    Tezzies constitute investment contracts and are therefore subject to federal securities laws, including the registration requirements promulgated thereunder.

178.    Defendants, in the offer and sale of Tezzies securities, by the use of the means and instruments of transportation and communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes, and artifices to defraud.

179.    In the offer and sale of the Tezzies securities and as part of their scheme to defraud, Defendants made false and misleading statements of material fact and omitted to state material facts to investors and prospective investors, as more fully described above.

180.    Defendants engaged in the conduct alleged herein knowingly or with reckless disregard for the truth.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

181.    As a direct and proximate result of the foregoing, Defendants have each violated Sections 17(a)(1) of the Securities Act, 15 U.S.C. §§ 77q(a)(1).

182.    Defendant KATHLEEN BREITMAN is subject to liability by virtue of her top-level executive position with DLS and her undeniable influence over THE FOUNDATION, which provided her the power to control or influence TEZOS's actions.   For example, KATHLEEN BREITMAN is an executive of DLS, is one of its only shareholders, and is responsible for much of the company's day-to-day operations, including its operations vis-à-vis Plaintiff and the Class Members.  As a top-level executive and controlling person of TEZOS, KATHLEEN BREITMAN knew of, or recklessly disregarded, the alleged misrepresentations made by TEZOS in connection with the ICO.

183.    Defendant KATHLEEN BREITMAN is a culpable participant in the fraudulent scheme described herein and caused TEZOS to engage in the acts and omissions which give rise to liability under 15 U.S.C. § 77l(a).

184.    Accordingly, Defendant KATHLEEN BREITMAN is a "controlling person" of TEZOS within the meaning of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

185.    Plaintiff and the Class Members have suffered damages as a result of Defendant KATHLEEN BREITMAN's violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

186.    Likewise, Defendant ARTHUR BREITMAN is subject to liability by virtue of his top-level executive position with DLS and his undeniable influence over THE FOUNDATION, which provided him the power to control or influence TEZOS's actions.  For example, ARTHUR BREITMAN is an executive of DLS, is one of its only shareholders, and is responsible for much of the company's day-to-day operations, including its operations vis-à-vis Plaintiff and the Class Members.  As a top-level executive and controlling person of TEZOS, ARTHUR BREITMAN

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

knew of, or recklessly disregarded, the alleged misrepresentations made by TEZOS in connection with the ICO.

187.    Defendant ARTHUR BREITMAN is a culpable participant in the fraudulent scheme described herein and caused TEZOS to engage in the acts and omissions which give rise to liability under 15 U.S.C. § 77l(a).

188.    Accordingly, Defendant ARTHUR BREITMAN is a "controlling person" of TEZOS within the meaning of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

189.    Plaintiff and the Class Members have suffered damages as a result of Defendant ARTHUR BREITMAN's violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 77o.

## COUNT III – FRAUD IN THE OFFER AND SALE OF SECURITIES IN VIOLATION OF SECTION 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 156 above, and further alleges:

190.    In the offer and sale of the Tezzies securities, Defendants -- by use of means or instruments of transportation or communication in interstate commerce or by use of the mails -- directly or indirectly: (a) obtained money or property by means of untrue statements of material facts or omitted to state material facts necessary to make not misleading the statements made, in light of the circumstances under which they were made; or (b) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of the Tezzies.

191.    Defendants acted at least negligently with respect to the facts and circumstances described above.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

192.    As a direct and proximate result of the foregoing, Defendants have each violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3).

193.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class Members have suffered damages in connection with their respective purchases of Tezzies securities in the TEZOS ICO.

## COUNT IV – RESCISSION OF CONTRACT

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1-156 above, and further alleges:

194.    The terms of the TEZOS ICO constitute a contract between: (1) Plaintiff and the Class Members, and (2) Defendants.

195.    The contract was entered into by and between Defendants and each Class Member between July 1, 2017 and July 15, 2017.

196.    The terms of the TEZOS ICO called for an investment of cryptocurrency by Plaintiff and the Class Members.

197.    The funds paid by Plaintiff and the Class Members pursuant to the TEZOS ICO were pooled by Defendants in an effort by Defendants to secure a profit for themselves and the investors. As a result, the investors, including Plaintiff and the Class, shared in the risks and benefits of the investment.

198.    Plaintiff and the Class Members relied on, and are dependent upon, the expertise and efforts of Defendants for their investment returns.

199.    The terms of the TEZOS ICO constitute an investment contract and is therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

**SILVER MILLER**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

200.    No registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the TEZOS ICO.

201.    Moreover, the TEZOS ICO Terms for Investors are unconscionable and illusory. As a benefit for the unilaterally-imposed bargain thrust upon them by TEZOS, Plaintiff and the Class Members might receive no Tezzies and no TEZOS network at all -- while Defendants purport a right to retain all of the funds and assets Plaintiff and the Class Members invested.

202.    As a result of Defendants' fraud, false representations, and violation of federal and state securities laws in connection with the TEZOS ICO, Plaintiff and the Class Members state their demand that the Contract be rescinded and canceled.

203.    To the extent that Plaintiff has received from Defendants any benefits through the contract -- though none are known to them at this time -- Plaintiff hereby offers to restore to Defendants those benefits, once they are identified and can be quantified.

204.    As a direct and proximate cause of Defendants' conduct, Plaintiff and the Class Members have been damaged.

205.    Defendant DLS is subject to liability because it solicited and otherwise participated in the sale to Plaintiff and the Class Members of the misrepresented and unregistered securities identified herein.  Moreover, Defendant DLS is subject to liability because it is believed to control, or have obtained control over, a large portion of the assets invested by Plaintiff and the Class Members which must be disgorged and returned to Plaintiff and the Class Members in effectuating the rescission of the contract into which they were unlawfully led.

206.    Defendant KATHLEEN BREITMAN is subject to liability because she solicited and otherwise participated in the sale to Plaintiff and the Class Members of the misrepresented and unregistered securities identified herein.  Moreover, Defendant KATHLEEN BRIETMAN

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

is subject to liability because she is believed to control, or have obtained control over, a large portion of the assets invested by Plaintiff and the Class Members which must be disgorged and returned to Plaintiff and the Class Members in effectuating the rescission of the contract into which they were unlawfully led.

207.    Defendant ARTHUR BREITMAN is subject to liability because he solicited and otherwise participated in the sale to Plaintiff and the Class Members of the misrepresented and unregistered securities identified herein.  Moreover, Defendant ARTHUR BRIETMAN is subject to liability because he is believed to control, or have obtained control over, a large portion of the assets invested by Plaintiff and the Class Members which must be disgorged and returned to Plaintiff and the Class Members in effectuating the rescission of the contract into which they were unlawfully led.

208.    Defendant THE FOUNDATION is subject to liability because it solicited and otherwise participated in the sale to Plaintiff and the Class Members of the misrepresented and unregistered securities identified herein.  Moreover, Defendant THE FOUNDATION is subject to liability because it is believed to control, or have obtained control over, a large portion of the assets invested by Plaintiff and the Class Members which must be disgorged and returned to Plaintiff and the Class Members in effectuating the rescission of the contract into which they were unlawfully led.

## COUNT V – ALTER EGO LIABILITY

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 156 above, and further alleges:

209.    Upon information and belief, at all times material hereto, each of the Defendants were principal, agent, affiliate, manager, alter-ego, co-venturer, partner, surety, guarantor, officer,

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com

director, or employee of the remaining Defendants and were at all times acting within the scope of such agency, affiliation, management, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged, with full knowledge of all of the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's and the Class Members' rights and the damages to Plaintiff and the Class Members proximately caused thereby.

210. Upon information and belief, there exists, and at all times material hereto existed, a unity of interest and ownership between and among Defendants, such that any individuality and/or separateness between them has ceased to exist.

211. Upon information and belief, DLS and THE FOUNDATION were mere shells, instrumentalities, and conduits through which Defendants carried on their business for THE BREITMANS' primary, if not sole, benefit. DLS and THE FOUNDATION were and are controlled, dominated, and operated by THE BREITMANS as their individual businesses and alter egos.

212. Upon information and belief, Defendants have intermingled their assets and obtained assets from other Defendants to suit their convenience and to evade U.S. regulations, liability to defrauded investors in the TEZOS ICO, payment of taxes, and other legitimate obligations.

213. Upon information and belief, Defendants have used their own assets, and those of other Defendants, for personal use and obtained funds from other Defendants' business accounts for their own personal use.

SILVER MILLER
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 516-6000
www.SilverMillerLaw.com